**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

———————————

MAUREEN DEAKIN, RACHEL CLERGE,
CHERYL JOHNSON, LESLEY MITCHELL,
MAY WOJCIK, DALE KESSLER,
and all others similarly situated,

      Plaintiffs,

v.                                  Case No. 1:17-cv-00773-MLG-KK

MAGELLAN HEALTH, INC., and
MAGELLAN HSRC, INC.,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Maureen Deakin and several other individuals worked as care coordinators ("CCs") for Defendants Magellan Health, Inc., and Magellan HSRC, Inc. (collectively "Magellan"), who provide case management and behavioral health services in New Mexico. *See generally* Doc. 121. Deakin claims that she and all other similarly situated CCs regularly worked more than forty hours per week without being paid overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New Mexico Minimum Wage Act ("NMMWA"), NMSA 1978, § 50-4-19, *et seq.* (1955). The Court conditionally certified an FLSA collective action under 29 U.S.C. § 216(b), Doc. 62, and discovery ensued.

Magellan now moves to decertify the FLSA collective, Doc. 280, while Deakin moves for class certification under Federal Rule of Civil Procedure 23(b)(3) to pursue NMMWA claims on behalf of herself and her fellow CCs. Doc. 285. Having reviewed the parties' filings and the applicable law and having held a hearing on both motions on January 17, 2024, Doc. 340, the

Court grants Deakin's motion for Rule 23(b)(3) class certification, Doc. 285, and grants in part and denies in part Magellan's motion to decertify the FLSA collective, Doc. 280.

## BACKGROUND

### I.     Magellan's Contractual Obligations

The New Mexico Human Services Department ("HSD") has implemented several programs intended to increase access to care for our state's Medicaid recipients. Among these efforts is the implementation of a "care coordination infrastructure" whereby managed care organizations ("MCOs") "administer a full array of services in an integrated model of care." Doc. 286-3 at 4. Presbyterian Health Plan ("PHP") is one of these MCOs, and it provides care coordination services pursuant to a contractual agreement known as the Medicaid Managed Care Services Agreement (the "HSD Contract"), which governs an MCO's obligations and responsibilities. Doc. 297-5 at 7. The HSD Contract requires PHP to provide care coordination services to its members,[1] Doc. 297-5 at 7, which it accomplishes by subcontracting to outside entities like Magellan. *See* Doc. 297-7 at 11:18-22.

Care coordination services, as the name suggests, are the means by which PHP (and other contracting MCOs) work to ensure that members receive the full panoply of available healthcare services. The HSD Contract requires PHP, and its subcontractor Magellan, to engage with members to identify their specific health needs and then follow up with those members to implement related health practices. *See generally* Doc. 297-5 at 7-18. In its capacity as a subcontractor for PHP, Magellan is obligated to comply with the HSD Contract. Doc. 297-3 at 8 (requiring Magellan to comply with "all applicable Program Requirements, including those provisions of the [HSD]

---

[1] Members are defined as individuals enrolled in New Mexico's Centennial Care Program (i.e., Medicaid) through PHP who are entitled to physical, behavioral, and long-term care services under the HSD Contract. *See* Doc. 297-3 at 3 ¶¶ M, P; 5 ¶¶ EE, JJ.

Contract applicable to subcontracts entered into by PHP[.]"). Magellan therefore structures its operational practices in accordance with the HSD Contract's requirements. Doc. 297-7 at 2, 12:2-5.

## II.     Care Coordination Process

The care coordination process is initiated by a CC who conducts an initial health risk assessment of a newly enrolled member or one who had a change in health care condition to obtain "basic health and demographic information." Doc. 286-4 at 8, ¶ 4.4.2.1. The CC completes this initial assessment through the administration of a survey tool, which is comprised of a series of pre-determined questions. *Id* at 9, ¶ 4.4.2.5. If the member's responses to that questionnaire indicate certain health risks, then the CC administers a second survey tool, referred to as a Comprehensive Needs Assessment ("CNA"). *See id.* at 7, 11. Like the initial health risk assessment, the CNA is a standardized questionnaire, and all CCs utilize the same CNA survey tool. *Id.* at 12, ¶ 4.4.5.4; *see also* Doc. 297-7 at 7, 33:11-34:11 (testimony of Magellan's Chief Operating Officer ("COO") Sarah Lopez that CCs all used the same CNA tool); Doc. 297-9 at 5, 91:13-21 (testimony of Magellan supervisor Lauren Tyler affirming that the questions on the CNA were "primarily, 'yes,' 'no,' multiple choice, or fill in the blank"); Doc. 280-1 at 385, 20:25-21:2 (testimony of CC Katherine Potts that CNAs were "all the same"); *id.* at 53, 25:18-19 (testimony of CC Carlos Campos that the CNA is "all multiple choice, yes or no"); *id.* at 66, 32:21-33:1 (testimony of Maureen Deakin that the CNA was "mostly . . . yes, no, multiple choice" but had limited options for "some free text that could be put in it"); *id.* at 333, 16:8-13 (testimony of CC Janice Jones that the CNA was "fill in the blank, yes-or-no questions, multiple choice"). The HSD Contract prohibits modifications of the CNA questionnaire without prior approval from HSD. Doc. 285 at 6; *see also* Doc. 286-4 at 12 ¶ 4.4.5.4 ("In performing the CNA [Magellan] shall use a tool

3

that has been approved by HSD . . . Any changes to the assessment tool must be approved by HSD thirty (30) [c]alendar [d]ays prior to use by [Magellan].").

While the CNA is formulaic, not all members will be presented with identical sets of questions. Variations may arise from members' individual responses about their particular health needs, but queries are nonetheless pre-populated and part of the CNA questionnaire.[2] Doc. 297 at 8; *see also* Doc. 280-1 at 208, 22:9-23:2 (testimony of CC Orlando Garcia that the CNA pre-populated questions and care plans for clients).

After completing the CNA, the CC enters the member's responses into a computer and an algorithm assigns a "Care Coordination Level" of 1, 2, or 3. Doc. 297 at 6; Doc. 297-5 at 10 ¶ 4.4.3.1. At Levels 2 and 3, the CC generates a care plan based on the CNA and then follows up with "Touchpoint" evaluations. Doc 297 at 6; Doc. 297-5 at 17 ¶ 4.4.9.1. These Touchpoints are simply phone calls or in-person visits to check on the member's compliance and comfort with the care plan. Doc. 280-1 at 231, 30:18-31:12 (testimony of CC Coshele Clitso that Touchpoints involve direct contact with members to evaluate progress in their care plans); Doc. 297 at 9; *see also* Doc. 280-1 at 212, 52:12-18; *id.* at 231, 29:25-30:4. The frequency of these contacts is directly related the member's level of need. Doc. 297 at 9; Doc. 280-1 at 70, 66:21-67:13 (Deakin's testimony that CCs could decide to have more frequent check-ins with a member based on the member's need and the CC's clinical judgment).

To ensure that CCs carry out their duties in accordance with the HSD Contract, Magellan requires uniform training on how to conduct home visits, interview clients, and how to perform CNAs, care plans, and Touchpoints. Doc 297 at 12; Doc. 297-7 at 7-8, 36:12-37:6 (COO Lopez's

---

[2] So, as an example, if the CC enters an affirmative response to a question about whether a member had diabetes, then a set of diabetes-related follow-up questions would pop up on the screen. Doc. 297 at 8.

testimony that Magellan provides uniform training to new CCs). CCs are also subject to close supervision and continual auditing to make sure that they do not deviate from the HSD Contract or Magellan's policies. *See* Doc. 297-7 at 11, 61:21-62:10 (COO Lopez's testimony detailing the extensive audit process for Magellan's care coordination services); Doc. 297-8 at 6, 49:25-50:9 (testimony of Magellan supervisor Danielle Guerrero that she monitors and audits CCs to ensure that CNAs are produced within established timelines); Doc. 297-9 at 3, 59:7-13 (supervisor Tyler's testimony that care plans are reviewed to ensure compliance with the HSD Contract).

### III.    Magellan's Alleged Overtime Violations

This case arises from Deakin's claim that as a CC she regularly worked more than forty hours per week and that she was not compensated for this additional labor. Doc. 121 at 2 ¶¶ 3-7. Deakin, on behalf of herself and other Magellan employees, sued for unpaid overtime wages and other damages pursuant to the NMMWA and FLSA. *See generally id.* She now moves for class certification of her NMMWA claims pursuant to Rule 23(a) and 23(b)(3). Doc. 285 at 1.

### DISCUSSION

### I.    Class Definition and Certification

Deakin seeks certification of her NMWWA claims and defines the proposed class as follows:

> All current and former Care Coordinators employed by Defendants in New Mexico from October 1, 2013 to the final date of judgment (the "Class"). The term "Care Coordinators" refers to individuals that provided care coordination services pursuant to the HSD Contract (and any amendments or restatements thereof) and held a job title that included the term "care coordinator," including the job titles "Care Coordinator," "Care Coordinator—Unlicensed," and "Care Coordinator—Licensed." The term "Care Coordinator" also includes individuals that performed the foregoing care coordination services under the HSD Contract and held the title "Senior Care Worker" prior to December 2016.

*Id.* at 1-2.

As the moving party, Deakin bears the burden of meeting the strictures of Rule 23, and this Court must conduct a rigorous analysis to ensure she has met those requirements. *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010). To that end, the Court begins by assessing whether Deakin has met Rule 23(a)'s threshold requirements of numerosity, commonality, typicality,[3] and adequacy. Specifically, Deakin must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

*Id.* Further, because Deakin seeks to certify the proposed class under Rule 23(b)(3), *see* Doc. 285 at 2, she must also establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The matters relevant to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

*Id.*

---

[3] The parties do not dispute the typicality element, and the Court finds that Deakin's claims are typical of the proposed class of CCs.

## II.      Rule 23(a) Requirements

### A.   Numerosity

Rule 23(a)(1) provides that the moving party must demonstrate that a class is so sizeable that "joinder of all members is impracticable." To meet this burden, it is incumbent on Deakin to "offer some evidence of established, ascertainable numbers constituting the class." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214-15 (10th Cir. 2014) (quotation omitted). And while the numerical size of the class is of primary importance, the Court may also consider pragmatic factors such as the inconvenience of joining all members of the class and geographical distribution of class members. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007) (observing that Rule 23(a)(1) requires "only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate"); *see also Felps v. Mewbourne Oil Co.*, 336 F.R.D 664, 670 (D.N.M. 2020) (observing that "geographical dispersion, degree of sophistication, and class members' reluctance to sue individually" all bear on the numerosity determination (quotation omitted)). Ultimately, the numerosity question turns on fact-specific inquiries and district courts are afforded wide latitude in making "an appropriate judgment call." *Colo. Cross-Disability Coal.*, 765 F.3d at 1215 (citing *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006)).

Here, Deakin estimates the proposed class comprises between sixty-four CCs,[4] Doc. 285 at 13, and 107 CCs—all of whom reside within this judicial district. Doc. 311 at 8 n.29. Those

---

[4] Deakin cites *In re Thornburg Mortgage, Inc. Securities Litigation*, 912 F. Supp. 2d 1178, 1221 (D.N.M. 2012), for the proposition that "forty members presumptively satisfies numerosity." Doc. 285 at 13 n.79. Deakin misunderstands *Thornburg*. That case points out that the Tenth Circuit has refused to apply a presumption that numerosity is met at a certain number of class members. 912 F. Supp. 2d at 1221.

figures are supported by the record. Internal e-mails between Magellan employees indicate that as of June 17, 2019, Magellan employed at least sixty-four individuals in CC roles, all of whom would be included in the class definition. Doc. 286-16 at 30-31. Deakin's counsel also provided a declaration that the proposed class would consist of approximately 107 New Mexico CCs based on a spreadsheet of Magellan's pay data going back to 2015. Doc. 311-1 at ¶¶ 3-4. Additionally, during the January 17, 2024, hearing, counsel for Deakin estimated that the class would contain between 100 and 150 members—a number with which Magellan's counsel seemingly agreed. Hearing Tr. at 128:18-129:7, Jan. 17, 2024.

Whether the proposed class is comprised of sixty-four CCs or some greater number, joinder of all parties would require a legal exercise that is neither productive nor efficient. *See Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (observing that the numerosity analysis includes consideration of "judicial economy arising from the avoidance of a multiplicity of actions"); *cf. Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."); *see also* § III, *infra* (discussing Rule 23(b)(3) predominance and superiority requirements). And district courts in this circuit have certified classes of similar sizes on several occasions. *See, e.g.*, *Felps*, 336 F.R.D. at 670 (certifying a class of at least sixty members); *M.G. ex rel. Garcia v. Armijo*, No. 1:22-cv-00325-, 2023 WL 8602960, at *11 (D.N.M. Dec. 12, 2023) (holding that a class of at least forty-seven children was "so numerous as to make joinder impracticable"); *Geiger v. Z-Ultimate Self Def. Studios LLC*, No. 14-cv-00240, 2016 WL 11697101, at *2 (D. Colo. June 22, 2016) (certifying a class with between forty and fifty members); *Bass v. PJCOMN Acquisition Corp.*, No. 09-cv-01614, 2011 WL 2149602, at *2 (D. Colo. June 1,

2011) (certifying a class of at least fifty members). The Court can find no basis to depart from this decisional authority. Because the proposed class is sufficiently large, and given the relevant practical considerations, the Court finds that the numerosity element has been satisfied.

### B. Commonality

With the numerosity question resolved, the Court turns to the commonality inquiry. "A finding of commonality requires only a single question of law or fact common to the entire class." *DG*, 594 F.3d at 1195. "Factual differences between class members' claims do not defeat certification where common questions of law exist." *Id.* Put another way, every class member need not be in a situation identical to that of the class representative to satisfy Rule 23(a)'s commonality requirement. *Id.* The salient consideration is whether the class members allege common contentions that are "central to the validity of each one of the claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In the employment context, courts have typically found the commonality requirement is satisfied "where employees claim that they were denied minimum wage or overtime compensation as a result of a corporate employment policy." *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 364 (S.D.N.Y. 2014).

The factual record suggests that common evidence will resolve the core issue in this case—whether CCs were wrongly classified as exempt from overtime pay requirements based on company policies and the nature of CCs' job duties. *See, e.g.*, *Felps*, 336 F.R.D at 671. *See* Doc. 280-1 at 91, 436 ¶ 12; *see also* Doc. 121 at 11 ¶ 81. Deakin has put forth evidence demonstrating that the CCs' job duties were uniform and done in accordance with the HSD Contract. For example, the CC job description requires *all* CCs to administer CNA questionnaires, to compile care plans based on those questionnaires, and to complete Touchpoints, all within established timeframes and under close supervision. *See* Background § I, *supra*. While individual CCs may attend to disparate

patient populations in different regions of the state, the core job responsibilities set by Magellan pursuant to the HSD Contract—CNAs, care plans, and Touchpoints—remain consistent for each worker. *Id.* Further, Deakin has provided testimony from numerous CCs showing that that they often worked more than forty hours per week. *See* Doc. 280-1 at 59-60, 68:18-72:10; 219-20, 92:15-93:9. This evidence bears on the issue of misclassification as applied to the entire class, thereby providing a common evidentiary framework that can resolve the misclassification issue— and by extension, the validity of Deakin's claims—in one stroke.[5] *See Dukes*, 564 U.S. at 350. Deakin's proposed class therefore satisfies Rule 23(a)'s commonality requirement.

## C. Adequacy of Representation

Federal Rule of Civil Procedure 23(g) establishes the criteria for adequacy of class counsel. *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 662 (D.N.M. 2019).[6] In appointing class counsel, the Court must consider "the work counsel has done in identifying or investigating potential claims," "counsel's experience in handling class actions" and the types of claims asserted, "counsel's knowledge of applicable law," and the resources counsel will commit to class

---

[5] Magellan claims that the relief sought—compensation for overtime hours—requires an examination of the specific hours worked by Deakin and each of her fellow CCs and that the variations in individual CCs' work hours undermine commonality. Doc. 295 at 18-20. While facially appealing, this argument is inconsistent with pertinent decisional authority. Courts have "routinely reject[ed] the argument that commonality is defeated by individualized questions regarding the number of hours worked" in employment class actions. *Felps*, 336 F.R.D. at 672 (quotation marks omitted). The relevant inquiry is whether CCs were wrongly classified as exempt from overtime pay requirements based on company policies and the nature of CCs' job duties. *See, e.g., id.* at 671.

[6] Technically, legal adequacy is assessed by examining two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002) (citation omitted). Here, the Court need only consider the latter question as Magellan does not identify any conflicts of interest, and it does not dispute that Deakin is an adequate class plaintiff.

representation. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). The Court may also consider other matters relevant "to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. (g)(1)(B).

This Court finds that Deakin's counsel, Travis M. Hedgpeth of The Hedgpeth Law Firm, PC, is qualified to act as class counsel. Hedgpeth identified and pursued Deakins' claims by obtaining conditional collective action certification under the FLSA and managing the FLSA notice process. Doc. 285 at 13; *see also* Doc. 62. He also actively engaged in discovery and moved this case towards class certification under Rule 23 and collective certification under the FLSA. Regarding his experience and legal knowledge, Hedgpeth provided a declaration laying out his considerable experience litigating wage and hour lawsuits, including his role as counsel in no fewer than fifteen other employment class actions. Doc. 286 at 4-6 ¶ 28 (declaration from counsel outlining his experience, including names and citations to fifteen other ongoing or settled cases, many involving salaried employees in the healthcare and insurance industries). He further detailed his role as a contributing author for an upcoming wage-and-hour treatise and as an active member of the employment litigation bar. *Id.* at 6 ¶ 30. Finally, in terms of resources, Hedgpeth engaged two additional attorneys, J. Derek Braziel of Lee & Braziel, L.L.P., and Jack L. Siegel of Siegel Law Group PLLC, to serve as co-counsel, both with extensive experience litigating large-scale employment class actions. *Id.* ¶¶ 31-32. Hedgpeth and his co-counsel have spent a large amount of time and effort representing Deakin and the putative class and have provided no indication that they will cease to do so.

Magellan does not question Hedgpeth's qualifications nor those of his co-counsel. Instead, Magellan points to several disputes that have arisen in this litigation to support its claim of inadequacy. Doc. 295 at 15-16. To be sure, this litigation has been exceedingly contentious and

marked by behavior that deviates from decorum and the professionalism this Court expects. Nevertheless, Deakin's counsel has competently prosecuted this action on behalf of the proposed class.[7] The Court finds that Hedgpeth meets the requirements of Rule 23(g). He and his co-counsel may serve as class counsel.

## III.   Rule 23(b)(3) Requirements

### A.   Predominance

"Rule 23(b)(3)'s predominance inquiry is related to, albeit more demanding than, Rule 23(a)(2)'s commonality requirement." *Felps*, 336 F.R.D. at 675 (text only). "The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Predominance thus "requires that 'common questions subject to generalized, classwide proof *predominate* over individual questions.'" *Felps*, 336 F.R.D. at 675 (quoting *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014)). "It is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018) (quoting *CGC Holding.*, 773 F.3d at 1087). Rather, the question is "whether

---

[7] The authority Magellan offers in support of its position is factually distinct from most of the issues that have surfaced in this lawsuit. Specifically, those matters deal with substandard representation of a client as opposed to fights with opposing counsel. *See Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263-64 (2d Cir. 2021) (affirming decertification of a class where counsel attempted to delay trial, attempted to reopen discovery, failed to submit adequate witness lists, and indicated that only two class witnesses would be called at trial); *Shi Ming Chen v. Hunan Manor Enter., Inc.*, No. 17 Civ. 802, 2021 WL 2282642, at *4-8 (S.D.N.Y. June 4, 2021), *report and recommendation adopted sub nom. Shi Ming Chen v. A Taste of Mao, Inc.*, No. 17 Civ. 802, 2021 WL 3727093 (S.D.N.Y. Aug. 20, 2021) (detailing the litany of adverse competency findings against putative class counsel—the same attorney at issue in *Jin*). That decisional authority is simply not on point.

the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id*. (quotation marks omitted).

In considering the matter, the Court begins by characterizing the issues related to the class claim as common or individual. *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 838 (10th Cir. 2023). The Court next weighs the issues to determine whether common questions of fact and law predominate. *Id.* The plaintiff need not show that all the elements of the class claim entail common questions of fact or law or that the answers to those common questions are dispositive. *Id.* (referencing *CGC Holding*, 773 F.3d at 1087). Instead, the plaintiff must only show that at least one common issue predominates, even if there are remaining individual issues, including damages. *Id.*

The core issue in this case is whether Magellan's misclassification of CCs as exempt, in concert with its practice of assigning more work to CCs than they could reasonably complete in a forty-hour work week, violates the NMMWA. Whether this question can be resolved through common proof depends on Magellan's policies and practices and whether both are applicable to all CCs. Predictably, the parties have divergent perspectives on the matter.

Magellan asserts that the predominate issue in this case turns on the differences in the day-to-day working conditions of individual CCs, which necessitates a fact-intensive, individualized inquiry. Doc. 295 at 18. But these individual circumstances do not bear on whether Magellan misclassified class members as exempt or whether Magellan assigned more work than could be completed in a forty-hour workweek. While CCs were assigned to disparate individual work regions and patient populations, their work obligations were largely uniform. Testimony and documentary evidence indicates that CCs were tasked with the same duties (CNAs, care plans, and Touchpoints). *See* Background § 1, *supra*. And while there is some limited evidence indicating

some CCs performed additional (but ancillary) tasks as part of their employment,[8] their fundamental work obligations were common regardless of the member's identity or geographic location. Since the CCs all performed the same core duties—set by Magellan pursuant to its own job description, *see* Doc. 280-1 at 91, and contractual obligations to HSD and PHP—the question of whether Magellan misclassified CCs as exempt predominates over the discrete working conditions of individual CCs in different locations or with different patient populations.

Magellan also points out that this case will require individual inquiries into the amount of overtime CCs worked along with the resulting damages. Doc. 295 at 13, 19-20. This is likely true, but differences in hours worked and damages are not sufficient to defeat class certification. *See, e.g.*, *Felps*, 336 F.R.D at 677 (holding that courts routinely and roundly reject the notion that the issue of individual hours worked necessarily predominates over common misclassification questions); *see also Payne*, 332 F.R.D. at 667 ("[D]ifferent amounts of damages for plaintiffs and class members, and separate calculations of damages do not defeat class certification."). The issue of individualized hours worked is commonplace in wage-and-hour class actions, and it does not

---

[8] Magellan cites testimony providing that CCs performed additional job duties. This evidence demonstrates that these additional duties were merely peripheral to the core responsibilities: CNAs, care plans, and Touchpoints. *See* Doc. 280-1 at 51, 20:17-23; 52, 21:6-13 (CC Carlos Campos helped provide doctor referrals from a list provided to him and helped verify appointments or provide contact information); *id.* at 72, 86:11-14; *id.* at 78, 121:10-18 (Deakin provided referrals to resources based on a list and "coach[ed] or help[ed] member on how to work with doctors and professionals, like giving fact[s] . . . that might help them work with doctors better"); *id.* at 217, 71:16-24 (CC Orlando Garcia observed progress meetings for members); *id.* at 241, 109:13-110:25 (CC Coshele Clitso sometimes addressed calls from members expressing suicidal ideation); *id.* at 335, 21:18-22:13 (CC Janice Jones provided information about community resources based on a list); *id.* at 343, 106:17-107:3 (CC Jones sometimes helped a member's parent or guardian complete developmental disability waiver application); *id.* at 386, 23:20-24:7 (CC Katherine Potts gave information about resources from a list provided to her); *id.* at 417, 79:6-25 (CC Carolina Gutierrez gave information about resources from a list provided to her).

overwhelm the shared questions regarding misclassification of CCs as exempt from overtime payment.[9]

In sum, the common predominant issue here is whether Magellan's uniform classification of CCs as exempt violated the NMMWA. Deakin seeks to answer that question by establishing through common proof[10] that Magellan's classification policies and standardized expectations led CCs to work unpaid overtime, rather than variations in working conditions and settings. *Felps*, 336 F.R.D. at 675-76 ("Courts routinely have found predominance where, as here, the challenged policy is common to the class as a whole and the proposed class members shared similar job duties.") Accordingly, the Court finds that Rule 23(a)'s predominance is satisfied.

### B.  Superiority

The superiority inquiry looks to the pragmatic considerations associated with class action lawsuits; it entails "balancing the desirability of class treatment with the likely difficulties in managing a class action, among other things." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 471 (6th Cir. 2017) (internal quotation marks omitted). Specific points to assess include "(A) class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already" underway; "(C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing" the proposed class action. Fed. R.

---

[9] That a class may include some members who did not actually work unpaid overtime is not necessarily fatal to class certification. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable. . . . Such a possibility or indeed inevitability does not preclude class certification[.]").

[10] That common proof includes, inter alia, the HSD Contract, Magellan's regulations and policies, and deposition testimony, which, taken together, can establish whether Magellan improperly classified CCs as exempt from the NMMWA's overtime protections.

Civ. P. 23(b)(3)(A)-(D). However, this list is nonexhaustive and courts may consider "the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

The parties' chief dispute regarding superiority centers on Rule 23(b)(3)'s first factor: individual interest in controlling the prosecution of putative class members' claims. Magellan questions the propriety of class relief given that some class members may have unusually valuable claims.[11] Doc. 295 at 20-21. Its argument is not persuasive. A class action may yet be a superior means of resolving group claims where it "will 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"[12] *CGC Holding Co.*, 773 F.3d at 1096 (quoting *Amchem Prods., Inc.*, 521 U.S. at 615). For the reasons explained previously, that is the case here.

Perhaps more significantly, Magellan's argument prioritizes the few over the many. If accepted, it would prevent the vast majority of class members from adjudicating their NMMWA claims merely because a small number of class members may have significant damages.[13] This outcome is directly at odds with the primary purpose of Rule 23(b)(3)—the "vindication of the

---

[11] Magellan identifies seven individuals with potentially significant damages as support for its contention. *Id.* at 21; *see also* Doc. 295-1 at 8-9, 17, 26, 35, 44, 53, 62 (interrogatory responses establishing value of claims submitted by plaintiffs opting-in to the FLSA collective action).

[12] Further, claimants have an adequate remedy under Rule 23(b)(3), which is to opt out of the class and pursue their claims individually. *See Anderson Living Trust v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 409 (D.N.M. 2015) ("[T]he court must keep in mind a powerful fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class." (referencing Fed. R. Civ. P. 23(c)(2)(B)).

[13] Of course, the only reason these class members may be entitled to significant recompense is because they worked for several months or years without receiving overtime pay.

rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc.*, 521 U.S. at 617 (internal quotation marks). The Court declines to prioritize the interests of a slim minority of individual CCs with potentially high-value claims over those of the broader class.

Application of Rule 23(b)(3)'s remaining factors further support the superiority of a class action in this matter. First, there is no other litigation addressing the claims presented—i.e., no individual CCs have sued Magellan for NMMWA claims arising from the same or similar facts presented here. *See Anderson Living Trust*, 306 F.R.D. at 408 (noting that the advisory notes to Rule 23 require courts to consider any pending litigation by individuals brought in relation to class claims). As it stands now, the only way class members can adjudicate their claims is through this litigation. Next, the scope of the class—both in terms of geography and size—is reasonable. The class is comprised of between sixty-four and 150 members and includes only those CCs working in New Mexico. Thus, the class size is manageable and resolution of the matter in this district is appropriate. Finally, the proposed class includes current and former Magellan employees who would be unlikely to bring individual lawsuits for Magellan's alleged overtime violations. Courts have consistently observed that fear of economic retaliation dissuades employees from suing their employers. *See, e.g.*, *Kasen v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 12 (2011) (noting that the FLSA's antiretaliation provisions prevent "fear of economic retaliation from inducing workers [to] quietly accept substandard conditions." (text only)); *Damassia v. Duane Reade, Inc.*, 250 F.R.D.152, 163 (S.D.N.Y. 2008) (noting that employees may feel intimidated about participating in a collective employment action).

Relying primarily on *Muecke v. A-Reliable Auto Parts and Wreckers, Inc.*, No. 01 C 2361, 2002 WL 1359411 (N.D. Ill. June 21, 2002), Magellan raises a final argument that Rule 23(b)(3)

certification is incompatible with the collective action provisions of the FLSA. Doc. 295 at 22-23. In that case, the district court declined to certify a Rule 23(b)(3) class action where the plaintiffs also brought an FLSA collective action. *Muecke*, 2002 WL 1359411, at *2 (reasoning that because class members could opt in to the FLSA action, class certification under Rule 23(b)(3) "[made] no real sense."). *Muecke*, however, is no longer relevant. In *Ervin v. OS Restaurant Services, Inc.*, 632 F.3d 971, 977-78 (7th Cir. 2011), the Seventh Circuit held that combined actions are not only compatible but preferable because unified proceedings are consistent with the text of the FLSA and provide clear pathway in resolving collective wage claims. Moreover, Chief Judge William P. Johnson rejected this argument previously in this litigation finding that FLSA and state law class actions can operate concurrently. *See* Doc. 119 at 7 (citing *Ervin* for the proposition that hybrid actions are permissible). So, to put it succinctly, Magellan's use of *Muecke* is out of date, ill-informed, and has already been disposed of previously. There is nothing incompatible in combining an FLSA collective action and a Rule 23(b)(3) class action in the same case. Magellan fails to refute Deakin's argument that class adjudication is the superior method of resolving in this case.

## IV.    Conclusion on Class Certification

The Court finds that Plaintiffs have satisfied the Rule 23(a) requirements of numerosity, typicality, commonality, and adequacy of counsel, as well as the Rule 23(b)(3) requirements of predominance and superiority. Class certification is appropriate.

## V.    Collective Action Under 29 U.S.C. § 216(b)

Under 29 U.S.C. § 216(b), a representative plaintiff may bring a collective action on behalf of "similarly situated" employees for violations of the FLSA. The purpose of a collective action is to give plaintiffs an advantage in vindicating their rights by pooling resources while also allowing

for the efficient resolution of common issues in one proceeding. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Unlike Rule 23 class actions, FLSA collective actions require putative class members to opt in to the class rather than opt out. *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001); § 216(b) (establishing the opt-in requirement). Consequently, district courts may authorize the representative plaintiff to notify other putative class members that they may opt in to the lawsuit. *Guarriello v. Asnani*, 517 F. Supp. 3d 1164, 1171 (D.N.M. 2021).

The relevant inquiry in determining whether an FLSA collective action can proceed is whether the plaintiff is "similarly situated" to members of the proposed class. *Id.* Since § 216(b) does not define "similarly situated," courts typically apply a two-step ad hoc process to determine whether members of the proposed action satisfy § 216(b). *Thiessen*, 267 F.3d at 1105. The first step is conditional certification, which "require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Id.* at 1102 (quotation marks omitted). If the plaintiff meets this threshold requirement, notice can be sent to potential opt-in plaintiffs and discovery can proceed on the merits. *Id.* at 1102-03. Once discovery has closed, the district court makes the second, stricter determination of whether the collective is similarly situated, usually prompted by a defendant's motion to decertify the collective. *Id.* at 1103; *see also Calvillo v. Bull Rogers, Inc.*, 267 F. Supp. 3d 1307, 1310 (D.N.M. 2017). The second determination is based on several factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant

which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations[.]" *Thiessen*, 267 F.3d at 1103 (quotation omitted).[14]

## VI.    Narrowing the Collective

On October 5, 2018, the Court conditionally certified the following collective:

Defendants' current and former, non-supervisory employees who worked for Defendants in at least one workweek for over 40 hours in one workweek over the past three years; who received their pay on a salary basis; worked under a job title within Defendant's "care management job family" containing the terms "Care Coordinator" or "Care Manager"; and whose job duties included Care Management Work.

Doc. 62 at 15-16. This proposed collective was national in scope, with potential opt-in plaintiffs in thirty-one states and the District of Columbia. *Id.* at 8. Deakin subsequently sent a court-approved notice form, Doc. 63-1, to potential collective action plaintiffs. *See* Doc. 65. Out of approximately 935 current and former Magellan employees who received notice, 222 employees opted in to the FLSA collective. Doc. 280 at 6. Since the notice period closed, thirty-one opt-in plaintiffs have withdrawn from the litigation or failed to participate in discovery. *Id.* at 6-7. The notice and discovery periods have closed. *See* Doc 104 at 1; Doc. 231.

After those deadlines lapsed, Deakin informed Magellan that she intended to narrow the proposed FLSA collective to eliminate CCs with disparate job types and geographic variability, thereby limiting the collective Magellan employees in New Mexico. Doc. 263 at 6. This amended collective is defined as follows:

All current and former Care Coordinators employed by Defendants in New Mexico from October 1, 2013 to the final date of judgment (the "New Mexico Class"). The term "Care Coordinators" refers to individuals that provided care coordination services pursuant to the HSD contract (and any amendments or restatements thereof) and held a job title that included the term "care coordinator," including the

---

[14] *Thiessen* was an age discrimination case that borrowed the FLSA's standard for collective certification, so it included a fourth factor not applicable here. *See Calvillo*, 267 F. Supp. 3d at 1311 (employing only the first three steps in the FLSA context).

job titles "Care Coordinator," "Care Coordinator—Unlicensed," and "Care Coordinator—Licensed." The term "Care Coordinator also includes individuals that performed the foregoing care coordination services under the HSD Contract and held the title "Senior Care Worker" prior to December 2016.

Doc. 297 at 2.

Magellan objects to Deakin's proposal. It contends that the significant paring down of the collective demonstrates that certification was inappropriate at the conditional stage and that Deakin cannot adequately prosecute the case to trial. Doc. 280 at 26. Magellan also raises procedural concerns regarding decertified members of the conditional collective. Doc. 305 at 5-6.

The narrowing of a FLSA collective is common practice. *See Sandoval v. M1 Auto Collisions Ctrs.*, Case No. 13-cv-03230, 2016 WL 6561580, at *4 (N.D. Cal. Sept. 23, 2016) ("Courts may, in their discretion, clarify and narrow proposed FLSA collective actions in order to ensure that the certified collective action is consistent with the FLSA's requirements."); *see, e.g.*, *Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 931-32 (5th Cir. 2005) (interlocutory appeal between steps one and two noting that lower court "has already used its discretion to modify" scope of collective action); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 n.42 (11th Cir. 2008) (recognizing that district court narrowed collective definition at decertification stage); *Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F. Supp. 2d 1101, 1122-23 (D. Minn. 2009) (denying decertification of a narrowed class because narrowing the proposed class is within the court's discretion); *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 298-99 (E.D. Pa. 2010) (plaintiffs narrowed scope of collective over the course of decertification briefing and district court considered restricted collective in deciding decertification motion). Magellan concedes that point but notes that some courts that have ruled otherwise, holding that the collective will live or die based upon the initial definition. *See* Doc. 280 at 26 (first citing *Wright v. Waste Pro USA, Inc.*, Case No. 0:19-cv-62051, 2022 WL 377869, at *7 (S.D. Fla. Jan. 11, 2022); and then citing *Arnold*

*v. Directv, LLC*, Case No. 4:10-CV-352, 2017 WL 1251033, at *7 (E.D. Mo. Mar. 31, 2017)). This case is different. The district courts in those matters chose to decertify the entire collective rather than allow for the formation of subclasses, and there are no proposed subclasses in this litigation. *Wright*, 2022 WL 377869, at *7, *9; *Arnold*, 2017 WL 1251033, at *10. In this case, and by contrast, Deakin proposes to pare down the collective to a single, smaller group. As explained above, this is a common practice in § 216(b) cases. Accordingly, the Court will narrow the collective in this case and dismiss all non-New Mexico members without prejudice.

Second, Plaintiffs seek a 120-day toll on the statute of limitations for the non-New Mexico plaintiffs to give them the chance to re-file their claims. Doc. 297 at 23. Magellan also objects to this request, arguing that the FLSA does not toll the statute of limitations after a collective action is dismissed. Doc. 305 (citing *Garcia v. Crossmark, Inc.*, Civ. No. 13-693, 2014 WL 12482623, at *2 (D.N.M. Jan. 29, 2014)).

Magellan is correct on this issue. The statute of limitations is tolled from the day each of the opt-in plaintiffs joins the collective action, and it resumes after the collective action is dismissed. *Garcia*, 2014 WL 12482623, at *2. For time beyond that (i.e., the 120 days Deakin requests), the non-New Mexico plaintiffs can rely only on equitable tolling. *See id.* Equitable tolling is appropriate only in "extraordinary circumstances." *Clark v. Oklahoma*, 468 F.3d 711, 714 (10th Cir. 2006). Deakin has not identified any such circumstances here and so the Court denies Deakin's request for a 120-day toll.

## VII.   Collective Action Analysis

The factors to be considered in determining whether collective members are similarly situated are "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3)

22

fairness and procedural considerations." *Thiessen*, 267 F.3d at 1103 (quotation marks omitted). The Court finds that Deakin's narrowed collective satisfies each factor.

### A.  The New Mexico CCs faced similar factual and employment settings.

As explained in the Rule 23 discussion, *supra*, the work CCs do is largely identical. They conduct CNAs, create care plans, and follow up with Touchpoints. They work under the same HSD Contract, they work from home aside from their in-person visits to members, and they are closely supervised with daily or near-daily check-in meetings.

Even so, Magellan seeks to distinguish the CCs' various job duties arguing that individual employees had unique working conditions that preclude collective adjudication. Doc. 280 at 9. Magellan asserts that CCs' performance of their duties in various locations indicates the disparate nature of their employment. *Id* at 9-10 (citing deposition testimony of CC Carlos Campos and Deakin, both of whom would be included in the narrowed collective). Magellan also points to the different populations attended to by various CCs. Doc. 305 at 3. For example, Coshele Clitso worked mostly in foster care and residential facilities, Doc. 280-1 at 232, 36:12-23, while Maureen Deakin worked mostly with the developmentally delayed population, *id.* at 85, 180:1-6, and Janice Jones worked with children with autism, *id.* at 335, 23:14-19.

Magellan's proffered distinctions are ultimately tangential to the central question of work duties: did CCs perform the same tasks in their interactions (CNAs, care plans, and Touchpoints) with members? Any minor differences—at least those raised in Magellan's request for decertification of the collective—in working conditions do not constitute "disparate factual and employment settings" because the measurement for collective action is whether the employees are similarly situated, not whether their work is absolutely identical. *See Garcia v. Tyson Foods, Inc.*, 890 F. Supp. 2d 1273, 1280 (D. Kan. 2012) ("[T]he similarly situated requirement does not require

proof that each employee performed identical jobs[.]"); *Levine v. Vitamin Cottage Nat. Food Mkts., Inc.*, No. 20-cv-00261, 2023 WL 3648684, at *5 (D. Colo. May 25, 2023) ("[C]ourts have permitted FLSA claims to proceed collectively when disparities among the opt-in plaintiffs are not material and are outweighed by the similarities between those plaintiffs." (internal quotation marks omitted)). Magellan has not shown that the factual and employment settings of the New Mexico CCs were so different as to preclude collective action. Consequently, the Court finds that this factor weighs in favor of a finding that the New Mexico plaintiffs are similarly situated.

### B. Magellan's defenses are not individualized to particular members of the collective.

Magellan claims that considerations attendant to CCs' exempt status mandate decertification. In support of this position, Magellan asserts that individual plaintiffs performed "unquestionably" exempt work in their day-to-day activities and that the differences between the work settings of individual CCs will require a fact-intensive analysis of each CC's circumstances such that a collective trial is an "impossible scenario." Doc. 280 at 17, 19-20. Magellan does not expressly identify which FLSA exemption applies to the CCs at issue, but it presumably intends to raise the administrative exemption to the FLSA as a defense, given that it points to CC's purported use of "discretion and independent judgment" in the course of their work. *Id.* at 17; Doc. 305 at 9. *See* 29 U.S.C. § 213(a)(1) (exempting employees employed in administrative capacities); 29 C.F.R. § 541.202(a) (establishing that the administrative exemption applies to employees whose primary duties include the "exercise of discretion and independent judgment."). Regardless, the relevant question for purposes of collective certification is not whether an exemption applies. The proper consideration is whether the application of the exemption can be determined on a collective basis. *Cf. Thiessen*, 267 F.3d at 1106 (holding that the focus in cases involving policy-level employment decisions is on the pattern of decision making rather than on individual violations).

That is the case here. While Magellan provides evidence that the CCs employed discretion and independent judgment, it fails to show that they had substantively different job responsibilities requiring individualized analyses under the administrative exemption. To the contrary, Magellan's own evidence tends to show that the administrative exemption can—and should—be analyzed on a collective basis. *See, e.g.*, Doc. 280-1 at 57, 54:33-55:4 (testimony of CC Carlos Campos that Magellan's job description for CCs was accurate); *id.* at 78, 123:22-124:2 (testimony of Deakin affirming that Magellan's job description for CC's was accurate); *id.* at 91 (Magellan's internal job description setting the common essential functions of CCs).

Magellan raises credibility issues for certain opt-in plaintiffs, including Deakin, as additional grounds supporting decertification. Doc. 280 at 20-21; *see also* Doc. 305 at 8-9. It asserts that "[t]he deposition testimony of several opt-ins indicates that individual credibility determinations must be made to assess the veracity of their statements, rendering this class unsuitable for collective treatment." Doc. 280 at 20. To be sure, district courts have considered whether excessive individualized credibility inquiries would overcomplicate a collective action and undermine its purpose of addressing many claims at once, but Magellan's concerns regarding credibility are not the sort that necessitate decertification. *See Levine*, 2023 WL 3648684, at *11; *Merrill v. Pathway Leasing LLC*, Civil Action No. 16-cv-02242, 2019 WL 5078655, at *4 n.6 (D. Colo. Oct. 9, 2019); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103-04 (D. Kan. 2012).

For example, Magellan points to two individuals—Carolina Gutierrez and Katherine Potts—whose resumes included inaccurate accounts of their work as CCs. Doc. 280 at 21. Magellan concedes these individuals candidly discussed these issues during their depositions, thereby mitigating credibility concerns. *Id.* Additionally, Gutierrez and Potts both testified to

performing CNAs and creating care plans, the same sort of work that the other employees performed. *See* Doc. 280-1 at 385, 19:9-19; 387, 27:20-28:22; 417, 77:14-24.

Similarly, conflicting testimony between two other CCs—Coshele Clitso and Janice Jones—and their supervisors regarding the hours they worked, Doc. 280 at 21-22, is insufficient to decertify the collective. It is common practice in FLSA overtime cases for plaintiffs to argue that they worked overtime and for defendants to argue to the contrary; such disputes do not necessitate decertification. *See Underwood v. NMC Mortg. Corp.*, No. 07-2268, 2009 WL 1322588, at *4 (D. Kan. May 11, 2009) (remarking that an individualized inquiry into the existence and amount of overtime work for each plaintiff, "however, has more to do with Plaintiffs' damages as there will be a determination of the hours Plaintiffs worked and if the Plaintiffs were appropriately compensated. The need for this type of straightforward inquiry is not sufficient to defeat the propriety of a collective action.") (internal quotation marks omitted)); *see also Valencia v. Armada Skilled Home Care of N.M. LLC*, No. 1:18-cv-01071, 2023 WL 1993869, at *5 (D.N.M. Feb. 14, 2023) (remarking that disputes regarding existence or amount of overtime work for different plaintiffs have "more to do with Plaintiffs' damages" and are insufficient to decertify collective).

Ultimately, the credibility questions Magellan raises provide fertile grounds for impeachment but are unlikely to complicate trial matters to the extent that collective treatment is improper. The Court finds that this factor weighs in favor of finding that the New Mexico plaintiffs are similarly situated.

### C.  Fairness and procedural considerations favor collective treatment.

Magellan's remaining arguments address fairness and procedural considerations attendant to collective treatment, though none are availing. To begin with, Magellan simultaneously argues

that Deakin has provided too many declarations and too few declarations to support the collective's claims. Magellan states that "[t]he need for so many declarations" demonstrates differences among the plaintiffs, Doc. 305 at 8, but also that "more than 50% of the NMCCs either elected not to provide a declaration at all or they refused to agree to the draft declaration that Deakin's counsel placed in front of them," *id.*, suggesting—once again—serious differences among the collective. However, the declarations contain, by and large, the same pro forma language. *See generally* Doc. 297-11. The multiplicity of documents does not necessarily indicate differences. Similarly, the fact that some Plaintiffs did not sign a declaration does not necessarily mean that those plaintiffs experienced serious differences in the workplace compared to those who did sign a declaration; their silence indicates neither agreement nor disagreement with the declaration's terms.

Finally, Magellan once again raises concerns about individual damages of each CC. *Id.* at 11-12. In doing so, Magellan continues to disregard this district's repeated observation that when "generalized proof" applies to the "company-wide policy"—here, misclassification of CCs as exempt from overtime requirements—collective treatment is appropriate even when damages may differ. *See Medrano v. Flowers Foods, Inc.*, Civ. No. 16-350, 2021 WL 3290711, at *6 (D.N.M. Aug. 2, 2021) ("The Court concludes that individualized inquiries into the number of uncompensated hours worked do not warrant decertification. If such inquiries on damages were an obstacle to collective resolution in FLSA overtime cases, very few could ever be decided on a collective basis."); *see also Valencia*, 2023 WL 1993869, at *5 ("[T]he prospect of individualized damages defenses should not preclude collective adjudication of the critical issue in [FLSA] case[s]—whether Defendant employed an improper practice that was formulated centrally and resulted in uncompensated overtime." (quotation marks omitted)). The potentially individualized

damages of CC collective members do not render a collective action unfair or procedurally cumbersome.

## VIII.   Conclusion on FLSA Collective Action

The Court will revise the collective and adopt Deakin's narrowed definition. All non-New Mexico plaintiffs and all New Mexico plaintiffs who do not fall within the narrowed definition are dismissed without prejudice. Because equitable tolling is not justified here, the Court will deny Deakin's request to toll the statute of limitations for the dismissed plaintiffs for 120 days following the entry of this Order. As for the remaining New Mexico CCs, all three *Thiessen* factors weigh against decertification, and so the Court will deny Magellan's motion for decertification in all other respects.

## CONCLUSION

For the foregoing reasons, the Court finds that this action may proceed as a class action under Federal Rule of Civil Procedure 23(b)(3) and as a collective action under 29 U.S.C. § 216(b). The Court therefore orders as follows:

First, the Court grants Plaintiff's Motion for Class Certification under Fed. R. Civ. P. 23, Doc. 285, and certifies the following class:

> All current and former Care Coordinators employed by Defendants in New Mexico from October 1, 2013 to the final date of judgment (the "Class"). The term "Care Coordinators" refers to individuals that provided care coordination services pursuant to the HSD Contract (and any amendments or restatements thereof) and held a job title that included the term "care coordinator," including the job titles "Care Coordinator," "Care Coordinator—Unlicensed," and "Care Coordinator— Licensed." The term "Care Coordinator" also includes individuals that performed the foregoing care coordination services under the HSD Contract and held the title "Senior Care Worker" prior to December 2016.

The Court appoints Maureen Deakin as Class Representative and Travis M. Hedgpeth, J. Derek Braziel, Jack Siegel, and their respective law firms as Class Counsel. Because Magellan has not

stated a position on the form and content of Deakin's proposed judicial notice, Doc. 286-19, the parties are ordered to confer and submit a joint judicial notice form within ten (10) days of the entry of this Order. In the alternative, Magellan may file a stipulation approving Deakin's proposed judicial notice prior to the expiration of the ten-day deadline.

Second, the Court grants in part and denies in part Defendants' Motion for Decertification of the Conditionally Certified Collective Action, Doc. 280. The Court vacates the prior conditionally certified collective and certifies the following narrowed collective:

> All current and former Care Coordinators employed by Defendants in New Mexico from October 1, 2013 to the final date of judgment (the "New Mexico Class"). The term "Care Coordinators" refers to individuals that provided care coordination services pursuant to the HSD contract (and any amendments or restatements thereof) and held a job title that included the term "care coordinator," including the job titles "Care Coordinator," "Care Coordinator—Unlicensed," and "Care Coordinator—Licensed." The term "Care Coordinator also includes individuals that performed the foregoing care coordination services under the HSD Contract and held the title "Senior Care Worker" prior to December 2016.

To the extent that Magellan seeks decertification of this narrowed collective, that request is denied, but the Court grants Magellan's request to decertify non-New Mexico plaintiffs and New Mexico plaintiffs who do not fall within the narrowed collective. These plaintiffs are dismissed without prejudice. The Court denies Deakin's request for equitable tolling of the statutes of limitation applicable to the dismissed plaintiffs' claims.

It is so ordered.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA