IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MAUREEN DEAKIN, RACHEL CLERGE,
CHERYL JOHNSON, LESLEY MITCHELL,
MAY WOJCIK, DALE KESSLER,
and all others similarly situated,

    Plaintiffs,

v.   Case No. 1:17-cv-00773-MLG-KK

MAGELLAN HEALTH, INC., and
MAGELLAN HSRC, INC.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

Plaintiff Maureen Deakin worked as a care coordinator ("CC") for Defendants Magellan Health, Inc., and Magellan HSRC, Inc. (collectively "Magellan"), to provide care coordination services to New Mexico Medicaid members. Deakin, and the class of CCs she represents,[1] seeks to recover unpaid overtime wages from Magellan under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 et seq., and the New Mexico Minimum Wage Act ("NMMWA"), NMSA 1978, § 50-4-19, et seq. *See generally* Doc. 121. Magellan's primary defense is that Deakin, as class representative, was an administrative employee and therefore exempt from state and federal overtime requirements.[2] Doc. 122 at 48 ¶ 373. Deakin now moves for summary judgment on this specific issue. Doc. 284 ("Motion"). Having reviewed the relevant filings and the applicable

---

[1] The Court certified Deakin's proposed class in a separate order. *See* Doc. 355.

[2] Magellan also raised the FLSA's professional exemption as a defense to Deakin's claims. Doc. 122 at 48, ¶ 372. However, Magellan now concedes that the professional exemption does not apply. Doc. 296 at 11 n.3.

1

law and having held a hearing on the motion on January 17, 2024, Doc. 340, the Court grants Deakin's Motion.

## BACKGROUND

**I.      Care Coordination Process**

The New Mexico Human Services Department ("HSD") has implemented several programs intended to increase access for care to our state's Medicaid recipients. *See* Doc. 283-1 at 1-3. Among these efforts is the implementation of a "care coordination infrastructure" whereby managed care organizations ("MCOs") provide care coordination services to "members."[3] *Id.* at 4. Care coordination services, as the name suggests, are how MCOs enable members to access the full panoply of available healthcare services. *Id.* at 3. HSD contracts with several MCOs, including Presbyterian Health Plan ("PHP"), to provide care coordination services to New Mexico's Medicaid population pursuant to a managed care services contract ("HSD Contract"). *See id.* at 3; *see generally* Doc. 283-3. PHP, in turn, subcontracts with Magellan to assist with its contractual obligations, including care coordination services. *See generally* Doc. 283-5; *see also* Doc. 283-15 at 14; Doc. 283-16 at 2, 11:18-20. Magellan's contract with PHP mandates strict adherence to all care coordination requirements contained in the HSD Contract. Doc. 283-5 at 4; Doc. 283-16 at 3, 12:2-5; *see also* Doc. 233-1 at 2.

Deakin and other CCs are tasked with implementing the care coordination process, which begins with an initial health risk assessment of a newly enrolled member or one who had a change in health care condition to obtain basic health and demographic information. *See* Doc. 283-3 at 7 (setting the general requirements for the care coordination process). The CC completes this initial

---

[3] Members are individuals enrolled in New Mexico's Centennial Care Program (i.e., Medicaid) who are entitled to receive physical, behavioral, and long-term care services from MCOs. *See, e.g.*, Doc. 283-5 at 3 ¶¶ M, P; 5 ¶¶ EE, JJ; *see also* Doc. 283-1 at 3.

assessment through the administration of a survey tool, which is comprised of a series of pre-determined questions. *See id.* at 8-10. If the member's responses to that questionnaire indicate certain health risks, then the CC administers a second survey tool, referred to as a Comprehensive Needs Assessment ("CNA"). *Id.* at 11. Like the initial health risk assessment, the CNA is a standardized questionnaire. *Id.* at 12; *see also* Doc. 283-16 at 19-20, 103:25-104:4.

After completing the CNA, the CC enters the member's responses into a computer and an algorithm assigns a "Care Coordination level" of 1, 2, or 3. Doc. 283-3 at 10 ¶ 4.4.3.1. At levels 2 and 3, the CC generates a care plan based on the CNA and follows up with Touchpoint evaluations. *Id.* at 17 ¶ 4.4.9.1. These Touchpoints are simply phone calls or in-person visits to check on the member's compliance and comfort with the care plan. *See id.* at 14, 16; Doc. 283-16 at 18, 102:2-4; Doc. 283-17 at 5, 105:6-9.

To ensure compliance with all contractual obligations, Magellan's CCs are subject to close supervision and continual auditing. *See* Doc. 283-16 at 10-11, 61:21-62:10 (Chief Operating Officer ("COO") Sarah Lopez's testimony detailing the extensive audit process for Magellan's care coordination services). Magellan utilizes a variety of audit processes to closely track CCs' performance and work product, from the number of care plans and CNAs performed, *see* Doc. 283-13, to production timelines and care plan completion. *See* Doc. 283-11.

II.     **Deakin's Work as a CC and the Initiation of Litigation**

Deakin worked as a care coordinator for Magellan from September 2016 to December 2017. Doc. 283-7 at 7, 164:19-24; Doc. 283-8 at 1. Her duties included personal visits with members to complete CNAs, Doc. 296-1 at 40-41, 31:20-33:4, and following up to ensure that the resultant care plans were effective. *See id.* at 52, 89:3-21. Deakin spent approximately eighty percent of her time inputting the data necessary to produce CNAs and care plans, along with an

additional unspecified amount of time on Touchpoints. Doc. 283-7 at 8, 301:1-18. Magellan audited Deakin to ensure that she carried out her duties within contractually obligated timeframes. *Id.* at 9, 316:4-22. When Deakin did not meet her required metrics, Magellan placed her on a performance improvement plan and specifically noted her inability to adhere to the timelines set by the HSD and PHP Contracts. *See* Doc. 283-9 at 1-2, 4-5, and 7. Magellan ultimately fired Deakin while she was on medical leave. Doc. 284 at 5.

Deakin subsequently sued Magellan to recover allegedly unpaid overtime wages for herself and her fellow CCs under the NMMWA and the FLSA. *See generally* Doc. 121. Magellan denies liability asserting that Deakin is not entitled to overtime wages because CCs are exempt from overtime pay under the FLSA's administrative exemption. Doc. 122 at 48 ¶ 373. Deakin now seeks summary judgment on that matter. Doc. 284.

## STANDARD OF REVIEW

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court views the evidence and draws reasonable inferences in the light most favorable to the nonmoving party. *Utah Animal Rts. Coal. v. Salt Lake Cnty.*, 566 F.3d 1236, 1242 (10th Cir. 2009). The moving party bears the burden to establish that no genuine issue of material fact exists. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could influence the outcome of the lawsuit under the applicable law. *Id.* A dispute over a material fact is genuine if a rational jury could find for the nonmoving party based on the evidence presented. *Id.* So, the inquiry on a motion for summary judgment is "not whether [the judge] thinks the evidence unmistakably favors one side or the other

4

but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## DISCUSSION

The FLSA and the NMMWA require employers to pay overtime wages to workers who perform more than forty hours of work per week. 29 U.S.C. § 207(a); NMSA 1978, § 50-4-22(D) (2021). Certain employees are exempt from overtime requirements, including those "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); NMSA 1978, § 50-4-21(C)(1) (2021). Whether a particular job duty falls within that exemption is determined by reference to United States Department of Labor ("DOL") regulations.[4] *See generally* 29 C.F.R. §§ 541.0-541.710 Those regulations provide that an "employee employed in a bona fide administrative capacity" (and therefore an employee exempt from overtime laws) as one who: (1) is salaried at a rate of at least $844 per week;[5] (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(1)-(3) (effective July 1, 2024). Thus, the question presented is whether

---

[4] While the NMMWA has no analogous set of interpretive regulations, New Mexico courts frequently look to federal regulations when addressing the NMMWA's exemptions. *See Rivera v. McCoy Corp.*, 240 F. Supp. 3d 1150, 1155 (D.N.M. 2017) (collecting New Mexico cases applying federal minimum wage regulations).

[5] The 2016 and 2020 versions of 29 C.F.R. § 541.200 were effective during this lawsuit and set a salary amount of not less than $684 per week. *Cf.* 29 C.F.R. § 541.600(a)(1) (outlining the current salary requirement).

Deakin, as Magellan's employee, meets these three criteria. Because the parties do not dispute the regulation's salary requirement, the Court cabins its analysis to the second and third elements.

I. The "Directly Related" Criteria

The parties' first dispute whether Deakin's duties[6] are (or are not) "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Deakin, arguing in the negative, frames her position in terms of the administrative-production dichotomy. *See* Doc. 284 at 10-12. This principle distinguishes employees who oversee the affairs of a business from those whose "primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." *Rodriguez v. Peak Pressure Control, L.L.C.*, No. 2:17-cv-00576, 2020 WL 3000414, at *4 (D.N.M. June 4, 2020) (quoting *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 336 (5th Cir. 2017)). Those

---

[6] Courts typically define the scope of an employee's primary duties before determining whether those duties disqualify the employee from FLSA protections. *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 827 (10th Cir. 2012). An employee's primary duty is "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The primary duty determination is "based on all the facts in a particular case," with primary emphasis on the employee's whole job. *Id*. Here, Deakin spent the bulk of her time performing CNAs, generating care plans, and following up with Magellan's clients via Touchpoints. Doc. 284 at 4-5; Doc. 283-7 at 8, 301:10-18. There is no material dispute on this issue. Magellan admits that Deakin's main responsibilities were working with members for several hours to complete CNAs and then continually reviewing whether her care plans were effective by scrutinizing members' ongoing needs. Doc. 296 at 3l; *see also* Doc. 296-1 at 53, 122:19-124:2.

employees "involved with 'administering the business affairs of the enterprise'"[7] are exempt while those "'producing the commodity' of the business" are not. *Dewan*, 858 F.3d at 337.

Deakin's work as a CC plainly falls on the production side of the dichotomy. Deakin and other CCs deliver care coordination services, which take the form of CNAs, care plans, and Touchpoints performed by CCs for PHP members. Doc. 284 at 12. In the provision of these services, which the HSD contract characterizes as "deliverables," Doc. 283-3 at 29-33, Magellan does not allow CCs to make managerial decisions, oversee operations, or oversee high-level administrative functions. *See* Doc. 283-16 at 21-27, 111:16-117:5 (testimony from COO Lopez showing that CCs' job duties do not involve administrative functions). Magellan further restricts CCs' discretion to act outside established HSD guidelines by closely supervising and auditing CCs' work, subjecting them to penalties for any deviations. *See id.* at 10-12, 61:21-62:10; *see also* Doc 283-9 (Deakin's performance improvement plan subjecting her to penalties for failing to meet minimum audit scores); Doc. 283-10 (performance improvement plan penalizing CC Michelle Milliman for audit failures). CCs' duties are thus limited to the provision of care coordination services to individual members by Magellan's own policies. Magellan does not permit CCs to undertake the administrative tasks necessary to run or service its business.

That Deakin's duties are better characterized as "production" comports with guidance from the DOL. In two separate instances,[8] the DOL considered the status of case managers whose

---

[7] The "business affairs of the enterprise" involve the running of the business itself by determining its course or policies—i.e., the general administration of the enterprise rather than the core services it provides or goods it produces. *See Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002).

[8] The DOL's interpretation of its own regulations is highly persuasive, if not controlling. *See, e.g.*, *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that the DOL's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation" (text

7

primary duties were to work with their clients to gather information, assess their needs and costs of care, prepare care plans, and identify and implement services to meet the clients' needs. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter Fair Labor Standards Act (FLSA), 2006 WL 4512962 (Sept. 8, 2006); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter Fair Labor Standards Act (FLSA), 2007 WL 541650 (Feb. 8, 2007). Each time, the DOL concluded that case managers were not subject to the administrative exemption because their duties were to provide case management services rather than administer their employers' businesses. 2006 Opinion Letter, 2006 WL 4512962, at *3; 2007 Opinion Letter, 2007 WL 541650, at *2. The DOL reached the same conclusion for a company seeking guidance on the exempt status of so-called regional advocates—employees who provided case management services to disabled people. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter Fair Labor Standards Act (FLSA), 2005 WL 3308601, at *3 (Aug. 29, 2005).

The critical distinction identified in the DOL guidance is between those duties "related to providing the ongoing, day-to-day case management services" of the employer (including creating plans of care), which are *not* exempt, and "performing administrative functions directly related to managing the employer's business," which *are* exempt. *See* 2006 and 2007 Opinion Letters, *supra*. And in this case, Deakin's duties are comparable to case management services addressed in the relevant DOL opinion letters.

Magellan points to *Hamby v. Associated Centers for Therapy*, 230 F. App'x 772 (10th Cir. 2007) (unpublished), in response, arguing that Deakin is not a production worker and her duties relate to Magellan's general business operations. Doc. 296 at 12-13. That case is inapposite; it

---

only)); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872 (7th Cir. 2008) (applying the conclusions in a DOL opinion letter to an analogous set of facts involving the administrative exemption).

involved an individual who was employed as a "family advocate" whose job was to "assist client families by advising and counseling them regarding their problems and by advocating for them in order to promote [her employer's] goal of helping families of mentally ill children." *Hamby*, 230 F. App'x at 783-84. Applying the administrative-production dichotomy, the Tenth Circuit stated that Hamby's job duties could not "be likened to the type of work performed on a manufacturing production line or in selling a product in a retail service establishment." *Id.* at 784. The court concluded that Hamby's "work was directly related to the general business operations of [her employer]" and that she was subject to the administrative exemption. *Id.*

Magellan's reliance on *Hamby* is misplaced for several reasons. *Hamby* applied the 2002 version of the relevant federal regulations, *id.* at 782-83, which have since been amended multiple times. *See* n.4, *supra*. Further, *Hamby's* analysis provides limited guidance as to why the family advocate in that case performed duties directly related to the servicing of a business. *See Hamby*, 230 F. App'x at 783-84 (applying the directly related criteria in brief). This truncated analysis is perhaps explained by the fact that *Hamby* is an unpublished opinion which does not bind this Court's decision. *See* 10th Cir. R. 32.1(A); *see also United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005) (observing that unpublished orders are not binding precedent). Regardless, the DOL opinion letters provide clearer guidance as to the present matter because they apply current versions of the applicable regulations and offer in-depth analysis.

The Court acknowledges that the administrative-production dichotomy is an outmoded analytic device given the nation's modern service economy. *See, e.g.*, *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 123 (4th Cir. 2015) ("One reason that the dichotomy is imperfect is that while production-type work is *not* administrative, not all non-production-type work *is* administrative."); *Roe-Midgett*, 512 F.3d at 872 (observing that the administrative-production

9

dichotomy "is only useful by analogy in the modern service-industry context"). However, in this case, it remains a useful tool. The PHP Contract requires Magellan to carry out CNAs, generate care plans, and follow up with Touchpoints in accordance with the HSD Contract. Doc. 283-5 at 8. Magellan, through CCs like Deakin, carries out its contractual obligations by providing care coordination services to PHP's members. Deakin (and her fellow CCs) delivers the services—produces the commodity—that Magellan provides to PHP. Under this framework, her primary duties are not directly related to Magellan's management or business operations. Consequently, Deakin was not exempt from the FLSA and NMMWA's minimum wage requirements under Section 541.200(a)(2)'s directly related criteria.

## II. The "Discretion and Independent Judgment" Criteria

An employee may be exempt from overtime laws if their primary duty "include[s] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). The exercise of discretion and independent judgment generally requires comparison and evaluation of different courses of action, followed by an action or decision after the consideration of various possibilities. *Id.* Moreover, the employee must have the authority to carry out those actions on matters of significance. *Id.* As that language suggests, the salient consideration is "the level of importance or consequence of the work performed." *Id.*

Here, Magellan argues that Deakin and other CCs used discretion and independent judgment in their day-to-day work and are thus exempt administrative employees. Doc. 296 at 17. Magellan points to evidence establishing that in carrying out CNAs, care plans, and Touchpoints, CCs would use different methods and employed creative solutions to accomplish their tasks. *Id.* at 17-19. Magellan also cites testimony from its supervisory employees showing that CCs solved problems ad hoc as they carried out their duties. *Id.* at 19-20.

10

However, the question is not simply whether CCs used their discretion and judgment to carry out any job duty, no matter how trivial. Rather, the exercise of discretion and independent judgment must be addressed to matters of significance including:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). The salient inquiry is whether the employee has authority to run the business or to make major decisions on its behalf. *See Talbott v. Lakeview Ctr., Inc.*, No. 3:06cv378, 2008 WL 4525012, at *6 (N.D. Fla. Sept. 30, 2008).

Magellan proffers no compelling evidence that Deakin possessed the requisite authority to act on matters of significance. Although CCs exercised some limited discretion in carrying out CNAs, care plans, and Touchpoints, these tasks are merely routine duties. *See* Doc. 283-16 at 18-19, 102:19-103:19 (COO Lopez's testimony that CCs produce hundreds of care coordination deliverables per month); Doc. 283-7 at 8, 301:10-18 (Deakin's testimony that she spent over eighty percent of her time producing care coordination deliverables). They have no bearing on the administrative or managerial functions of Magellan's operations. *See* Doc. 283-16 at 22, 112:8-10 (COO Lopez affirming that "[CCs] are not responsible for running Magellan's business").

11

Accordingly, the Court finds that Deakin was not administratively exempt from the FLSA and NMMWA's overtime requirements.

## CONCLUSION

The undisputed facts of this case show that Deakin's primary duties were to provide care coordination services to PHP members in her role as Magellan's employee. Those duties were neither directly related to Magellan's business operations, nor did they involve the exercise of discretion and judgment on matters of significance. Accordingly, the Court finds that Deakin was not an administrative employee exempt from the FLSA and NMMWA's overtime protections. By extension, neither are the CCs subject to this class action. The Court grants Deakin's motion for summary judgment. Doc. 284.

It is so ordered.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA